UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ELIZABETH KEATING,<br>Plaintiff<br><br>vs<br><br>COMMISSIONER OF<br>SOCIAL SECURITY,<br>Defendant | Case No. 1:09-cv-540<br>Spiegel, J.<br>Hogan, M.J.<br><br><br>**REPORT AND**<br>**RECOMMENDATION** |

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner). Plaintiff appeals the Commissioner's determination that she is not disabled prior to February 2, 2007. This matter is before the Court on plaintiff's Statement of Errors (Doc. 8) and the Commissioner's response in opposition. (Doc. 14).

**PROCEDURAL BACKGROUND**

Plaintiff was born in 1957 and earned an associates degree in business. She has past relevant work as a real estate agent and travel agent. Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in July 2006 alleging an onset date of disability of January 2001 due to bipolar disorder. (Tr. 116-17, 121). Plaintiff's insured status for purposes of DIB expired on December 31, 2002. Her application was denied initially and upon reconsideration. Plaintiff then requested and was granted a de novo hearing before an administrative law judge (ALJ). Plaintiff, who was represented by counsel, appeared at a hearing before ALJ Michelle Cavadi.

On November 12, 2008, the ALJ issued a decision finding plaintiff to be disabled as of February 2, 2007, but not before that date. (Tr. 21). The ALJ determined that prior to February 2, 2007, plaintiff could perform other work in the national economy. (Tr. 20).

The ALJ determined that plaintiff suffers from severe bipolar disorder, but that additional impairments which include diabetes mellitus and high blood pressure were non-severe. The ALJ found that such impairments do not meet or equal the level of severity described in the Listing of Impairments. (Tr. 17). The ALJ also determined that plaintiff was not fully credible prior to February 2, 2007, the date she became disabled. (Tr. 19). The ALJ found that prior to February 2, 2007, the date plaintiff became disabled, she had the residual functional capacity (RFC) to perform a full range of work at all exertional levels. Secondary to her bipolar disorder, she should have no interaction with the public or co-workers; occasional interactions with supervisors; only routine changes in a work setting; work that requires only one or two-steps of instruction; and no concentrated exposure to hazards due to side effects from her medication. The ALJ determined that beginning on February 2, 2007, plaintiff had no exertional limitations, but secondary to her bipolar disorder she would not be able to work on a sustained basis, eight hours a day, five days a week, due to marked deficiencies in concentration. (Tr. 19). The ALJ found that plaintiff was unable to perform her past relevant work, but prior to February 2, 2007, she was able to perform a significant number of other jobs in the national economy. (Tr. 20). As of February 2, 2007, plaintiff was found to be disabled based on vocational expert testimony that there were no jobs in the national economy for an individual with plaintiff's age, education, work experience, and RFC. (Tr. 21).

Plaintiff's request for review by the Appeals Council was denied, making the decision of

2

the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423(a). Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To

3

establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

4

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical

5

impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. §§ 404.1520a and 416.920a. A standard review technique is completed at each level of administrative review for mental impairments. *Id.*

This special procedure requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R. § 404.1520a(c)(3). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rating using a five-point scale: None, mild, moderate, marked, and extreme. The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do *any* gainful activity. 20 C.F.R. § 404.1520a(c)(4). Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe. 20 C.F.R. § 404.1520a(d)(1).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then assess plaintiff's mental residual functional capacity. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

6

## MEDICAL EVIDENCE

Plaintiff was incarcerated from January 2001 until December 2006 for the attempted murder of her former business partner. (Tr. 31, 34, 356). Following her arrest in January 2001, plaintiff was hospitalized for 13 days in a psychiatric unit for her safety and diagnosed with Psychotic Disorder Not Otherwise Specified. (Tr. 188). She reported experiencing auditory hallucinations and loss of memory of the incident leading to her criminal charges. (Tr. 184, 188). She was tearful and had hand and body tremors. (Tr. 184).

In a February 2001 court-ordered evaluation, plaintiff reported that she suffered from "significant mood swings" for 15 years but never sought treatment for her symptoms. (Tr. 188). Plaintiff "related in a quiet, somewhat shy though pleasant, cooperative and involved manner" and "[t]he only impediment to communication was a result of [her] reported inability to remember much of the morning of January 2, 2001, prior to her alleged shooting of her business partner. . . ." (Tr. 189). During the interview, plaintiff's "cognitive processes were devoid of signs of any serious psychopathology as they were at all time logical, well associated, and relevant to the issues being discussed." (Tr. 190). Her recent and remote memories were quite impaired. (Tr. 191). The evaluator concluded:

> Ms. Keating is a woman who has suffered from significant, but not totally disabling, mood swings for much of her adult life. Some time in the last month or two, her symptoms became much more acute and she lapsed into a psychotic break that is currently well controlled by a mixture of four neuroleptic and mood stabilizing medications.

(Tr. 192).

In an April 2001 neuropsychological examination, James Phifer, Ph.D., reported that plaintiff's behavior leading to the attempted murder charge "was prompted by psychotic urges

7

that were a product of a severe mental disease or defect that interfered with [her] ability to appreciate the wrongfulness of her actions." (Tr. 202).

Records from the Ohio Reformatory for Women show that plaintiff was treated for her bipolar disorder throughout her incarceration. When she was initially seen in August 2001, it was reported that plaintiff had a history of auditory hallucinations which were stable with medication. (Tr. 237). Plaintiff was diagnosed with bipolar disorder and prescribed Zoloft, Klonapen, Zyprexa, and Depakote. (Tr. 235, 239). Her mental status examination revealed she was in no apparent distress, clean, and lucid; she was pleasant with a broad range of affect; her speech and language were normal; she had no blocking, no tangentiality, and no looseness in her thought process; her thought content and perceptions were appropriate to the environment; and she appeared capable of insight and good judgment. (Tr. 235). Plaintiff reported that her medication "stopped the cycling and depression." (Tr. 234).

During a September 2004 mental health evaluation, the evaluator noted that plaintiff responded well to medication, but experienced bouts of increased anxiety and depression during her adjustment to the institution. Over the past year, she had "done well, requiring a single dose adjustment with Depakote to address breakthrough mood swings." (Tr. 230). The mental status examination showed plaintiff was cooperative with good eye contact and had a neat and well-groomed appearance. (Tr. 231). Her mood was "nervous" due to situational factors, including her upcoming court date and husband's surgery, and her affect was "congruent, shaky." (Tr. 231). Her speech was "tremulous with occasional stuttering" and language was spontaneous. (Tr. 231). She was logical and goal oriented, and there was no evidence of psychosis or thought disorder. (Tr. 231). Her insight and judgment were assessed as good. (Tr. 232). Plaintiff's was assigned a

8

global assessment of functioning (GAF)[1] score of 70, indicating her symptoms were "mild" and that she was "generally functioning pretty well." (Tr. 232).

Plaintiff's next mental health evaluation in January 2006 showed plaintiff "continue[d] to respond favorably to treatment." (Tr. 227). Her mood was stable with Depakote and she had "adjusted well to [the] environment." (Tr. 227). She had good family support and got along well with her peers. (Tr. 227). The evaluator noted that plaintiff worked as a tutor and that she was "cooperative" and "pleasant." Her mood, affect, speech, language, thought process, thought content, and perceptions were within normal limits on mental status examination. (Tr. 228). Her insight and judgment were intact and she was assigned a GAF of 70-75. (Tr. 229).

During a mental status evaluation in August 2006, plaintiff was cooperative, responsive, neat and clean, but showed signs of nervousness and extraneous hand movements and shaking. (Tr. 225, 241). The flow of conversation was clear and coherent. (Tr. 225). Her affect and mood were assessed as "euthymic, full range." (Tr. 240). She exhibited no auditory or visual hallucinations and her cognitive functioning was within normal limits. (Tr. 242). She exhibited signs of obsessiveness and perfectionism which "can cause disruption in working with others." (Tr. 242). It was noted that plaintiff was "good at her job" and "enjoy[ed] interaction while

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." Id. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). Id. at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. See DSM-IV at 34. Individuals with scores of 51-60 are classified as having "moderate" symptoms. Id. The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." Id. A score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors" and represent "no more than slight impairment in social, occupational, or school functioning." Id.

9

teaching inmates." (Tr. 244). Her daily work activities were described as "adequate." (Tr. 244). In terms of work related mental capabilities, plaintiff was "able to understand and follow instructions exactly" and "demand[ed] perfection." (Tr. 245). She could "be responsible for self directive activities within average range." (Tr. 245). Plaintiff had "more difficulty with authority figures [because she] assesses their errors and must (feels compelled) [to] correct all errors" but related well with students. (Tr. 245). She was moderately limited in handling stressful situations and "her behavior becomes impulsive (sic) overwhelming and she may lose control." (Tr. 245).

In September 2006, state agency psychologist Caroline Lewin, Ph.D., reviewed the file and assessed that plaintiff was capable of understanding, remembering, and carrying out simple and detailed task instructions; was capable of maintaining attention for simple and detailed tasks; may have some trouble sustaining concentration, persistence and pace due to being a perfectionist, but could maintain concentration, persistence and pace for simple, repetitive tasks; and could relate to others superficially and adapt to settings with routine and predictable duties. (Tr. 206).

Subsequent to her release from incarceration in December 2006, plaintiff began treating with psychiatrist Jack Borders, M.D., who treated her from February 2007 through August 2008. On February 2, 2007, Dr. Borders diagnosed plaintiff with bipolar disorder, type I and anxiety disorder, NOS. (Tr. 346). He assessed that plaintiff suffered from a moderate impairment in hobbies and interests, a marked impairment in legal activities, and an extreme impairment in job performance abilities. (Tr. 346). At that time, plaintiff's GAF was rated as 50, indicating serious symptoms. (Tr. 346).

In August 2008, Dr. Borders assessed plaintiff's mental residual functional capacity and

10

found she would have no ability to deal with the public, interact with supervisors, and deal with stress. He further noted she would have a poor ability to function independently, follow work rules, use judgment and relate to co-workers. (Tr. 397). Dr. Borders also determined that plaintiff would have no ability to maintain attention and concentration and carry out detailed instructions; a poor ability to understand, remember and carry out simple job instructions; and a poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 398). Dr. Borders noted that plaintiff "hallucinates, has panic episodes, and at the best she has problems functioning at home with no pressure or interactions except immediate family or a few close church people." (Tr. 398). He opined that plaintiff "will never be able to engage in any type of gainful employment." (Tr. 398).

## HEARING TESTIMONY

Plaintiff testified she was 50 years old at the time of the administrative hearing. (Tr. 28). She did not have a driver's license because her doctor advised her not to drive due to her nerves. (Tr. 29). She did not remember the events of January 1, 2001, but had been told that she tried to shoot her business partner with her husband's gun. (Tr. 31). Before the incident, she was having difficulty sleeping and remembering things, and became easily upset. (Tr. 32).

While incarcerated, plaintiff saw a psychiatrist and psychologist once a month. (Tr. 33). She was prescribed medication which seemed to help. (Tr. 33). She held a job while in prison, and stated that everyone had to have a job. (Tr. 34). She was released from prison at the end of 2006. (Tr. 34).

## OPINION

Plaintiff assigns two errors in this case: (1) the ALJ erred in not finding plaintiff disabled

prior to February 2, 2007; and (2) the ALJ erred in assessing plaintiff's credibility for the period prior to February 2, 2007. For the reasons that follow, the Court finds the ALJ's decision is supported by substantial evidence and should be affirmed.

Plaintiff asserts the ALJ erred by ignoring the evidence from January 1, 2001 to February 2, 2007 showing she was disabled. In support of her argument, plaintiff cites to the January 3, 2001 report showing she suffered from auditory and possible verbal hallucinations and tremors (Tr. 184); the April 2001 report showing plaintiff had a severe mental disease (Tr. 201); and treatment records during her incarceration noting anxiety, depression, psychosis, tremors, and stuttering. (Doc. 8 at 9, citing Tr. 223, 230, 225, 231, 245). Plaintiff also cites to notes showing she suffered from nervousness, anxiety, impulsive behavior, feelings of worthlessness, and the need for perfection. (Doc. 8 at 10, citing Tr. 225, 230, 245, 240). Plaintiff argues that these findings show she "was not doing 'fine' with her mental condition during this period." (Doc. 8 at 10).

In determining that plaintiff was not disabled prior to February 2, 2007, the ALJ noted that plaintiff had no history of mental illness or treatment prior to the January 1, 2001 incident. While plaintiff testified that she had symptoms of bipolar disorder including forgetfulness, irritability, and sleeplessness, she never sought medical treatment for these symptoms before January 2001. (Tr. 19). The ALJ further noted that during her incarceration plaintiff's treatment records showed that medication kept her symptoms under control. *Id.* The ALJ also noted that plaintiff held a job in prison and did not seem to have any serious problems with the job. *Id.* Following her release from prison, however, plaintiff's condition deteriorated and she started treatment in February 2007. *Id.*

12

The ALJ's determination that plaintiff's bipolar disorder was not disabling prior to February 2, 2007 is substantially supported by the record and should be affirmed. There is no question that plaintiff suffered from the various signs and symptoms she identifies in her brief. However, this evidence merely establishes that she suffered from a severe mental impairment, a fact not in dispute. Yet, plaintiff points to nothing in the record showing such symptoms were disabling prior to February 2007.

As the ALJ reasonably found, there is no evidence that plaintiff sought or received any mental health treatment prior to the January 2001 shooting. Rather, the evidence shows that plaintiff "lapsed into a psychotic break" following acute symptoms resulting in the January 2001 incident. The following month, the court psychologist noted that her condition was "currently well controlled" by medication. (Tr. 192).

Likewise, the records from plaintiff's incarceration show that her symptoms improved with and were controlled by medication. In August 2001, her hallucinations were stable with medications which also "stopped the cycling and depression." (Tr. 234, 237). Her mental status examination revealed normal affect, mood, speech, language, and thought process. (Tr. 235). Her thought content and perceptions were appropriate and she was capable insight and good judgment. *Id.*

A September 2004 mental health evaluation showed plaintiff responded well to medication and had done well. (Tr. 230). The evaluator did note nervousness associated with plaintiff's upcoming court date and her husband's surgery, but attributed her symptoms to situational factors. (Tr. 231). While plaintiff exhibited "tremulous speech with occasional stuttering," she was logical, goal oriented, cooperative, had good insight and judgment, and

13

exhibited no signs of psychosis or thought disorder. (Tr. 231-232). She was assigned a GAF of 70 reflecting only "mild" symptoms. (Tr. 232).

Plaintiff's next mental health evaluation in January 2006 revealed a GAF score of 70 to 75, indicating only transient symptoms which caused "no more than slight impairment" in social or occupational functioning. (Tr. 229). *See* DSM-IV at 34. She continued to respond favorably to treatment and she had "adjusted well to [her] environment." (Tr. 227). Mental status examination revealed normal mood, affect, speech, language, thought process and content, and perception. (Tr. 228).

While plaintiff exhibited signs of nervousness, shaking, obsessiveness and perfectionism at her August 2006 mental status evaluation, her appearance, behavior, flow of conversation and thought, affect, mood, mental content, and sensorium and cognitive functioning were otherwise essentially within normal limits. (Tr. 225, 240-243). The evaluator noted that plaintiff enjoyed her interactions with the inmates she taught and that she was "good at her job." (Tr. 244).

A September 2006 residual functional capacity assessment by Dr. Lewin revealed that plaintiff was capable of understanding, remembering, and carrying out simple and detailed task instructions; was capable of maintaining attention for simple and detailed tasks; may have some trouble sustaining concentration, persistence and pace due to being a perfectionist, but could maintain concentration, persistence and pace for simple, repetitive tasks; and could relate to others superficially and adapt to settings with routine and predictable duties. (Tr. 206).

Taken together, this is substantial evidence supporting the ALJ's finding that plaintiff had the residual functional capacity for work involving no interaction with the public or co-workers; occasional interactions with supervisors; only routine changes in a work setting; work that

14

requires only one or two-steps of instruction; and no concentrated exposure to hazards due to side effects from her medication.

Plaintiff also takes issue with the ALJ's emphasis on plaintiff's ability to work while incarcerated. Plaintiff asserts she had no choice to work or not because all inmates were required to have a job. (Doc. 8 at 10, citing Tr. 34). She also asserts that having a job in prison does not indicate she performed well.

Contrary to plaintiff's argument, plaintiff's functional evaluation in August 2006 noted that plaintiff's daily work activities were assessed as "adequate," that she was "good at her job," and that she enjoyed her interactions with her students. (Tr. 244). In addition, plaintiff failed to cite to any evidence showing she was not successful at her job or had difficulty working. The ALJ properly considered this factor in determining whether plaintiff had the RFC for work prior to February 2007.

Substantial evidence supports the ALJ's finding that plaintiff had the RFC for work prior to February 2, 2007. Based on testimony from the vocational expert, the ALJ reasonably determined there were a significant number of jobs in the national economy that plaintiff could perform given her RFC prior to February 2, 2007. As such, the ALJ's decision should be affirmed.

Next, plaintiff contends the ALJ erred in assessing her credibility prior to February 2, 2007. Plaintiff argues that it is illogical to find a person credible after a certain date, but not before that date. (Doc. 8 at 11, citing Tr. 19).

The ALJ found plaintiff "not to be fully credible" as to her bipolar condition prior to February 2, 2007, but "generally credible" thereafter. (Tr. 19). The ALJ's credibility

15

determination is entitled to a high degree of deference by this Court and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983); *Beavers v. Sec.,* 577 F.2d 383, 387 (6th Cir. 1978). Plaintiff cites to much of the same evidence referenced in connection with her earlier argument in support of her credibility argument. Again, the evidence as a whole shows that despite her sporadic symptoms, plaintiff's mood and condition improved and stabilized on medication following the January 2001 incident and during her incarceration. The ALJ reasonably noted the absence of any job performance problems while in prison and the deterioration of plaintiff's condition upon her release from prison. (Tr. 19). In light of the evidence showing plaintiff's condition improved while she was incarcerated and the well-documented deterioration of her condition after February 2, 2007, the ALJ's decision that plaintiff was not fully credible prior to February 2, 2007 is substantially supported by the record and should not be disturbed by this Court.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 6/4/10

Timothy S. Hogan
United States Magistrate Judge

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ELIZABETH KEATING,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:09-cv-540
Spiegel, J.
Hogan, M.J.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **FOURTEEN DAYS** after being served with this Report and Recommendation ("R&R"). That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).